**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ALLAN S. RENWICK,

                Petitioner,

v.                                                CIVIL CASE NO. 03-CV-72377-DT

KURT JONES,                         HONORABLE DENISE PAGE HOOD
                                                   UNITED STATES DISTRICT JUDGE

                Respondent.
_____ /

**OPINION AND ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS
AND DECLINING TO GRANT
A CERTIFICATE OF APPEALABILITY**

**I. Introduction**

Allan S. Renwick ("Petitioner"), presently confined at the Carson City Correctional Facility in Carson City, Michigan, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The *pro se* petition challenges the legality of Petitioner's assault and murder convictions in Wayne County Circuit Court. The grounds for relief allege prosecutorial misconduct and ineffective assistance of counsel. The Court has concluded for reasons given below that the petition must be denied.

**II. Background**

Following a bench trial in Wayne County, Michigan, Petitioner was convicted of first-degree murder, MICH. COMP. LAWS § 750.316(1)(a), and assault with intent to do great bodily harm less than murder, MICH. COMP. LAWS § 750.84. The convictions arose from charges that Petitioner killed his ex-wife, Sharron Murphy, with a machete and assaulted his eight-year-old

daughter, Marcia Renwick, by slashing her wrist with a knife or razor.  The defense was that Petitioner's intoxication made him incapable of forming the intent needed to be found guilty and that the murder resulted from a frenzied attack, not premeditation.  On October 30, 2000, the trial court sentenced Petitioner to life imprisonment for the murder conviction and to a concurrent term of three to ten years in prison for the assault.

Petitioner raised his habeas claims in an appeal of right.  The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished *per curiam* opinion, but remanded the case for administrative corrections to the judgment of sentence and Petitioner's presentence investigation report.  *See People v. Renwick*, No. 232010 (Mich. Ct. App. Oct. 4, 2002).  On May 30, 2003, the Michigan Supreme Court denied leave to appeal because it was not persuaded that the questions presented should be reviewed.  *See People v. Renwick*, 468 Mich. 912; 662 N.W.2d 755 (2003) (table).

On June 19, 2003, Petitioner filed his habeas corpus petition, which raises the following claims for relief:

> I. Petitioner was deprived of his Fifth and Fourteenth Amendment rights to a fair trial, due process, and equal protection under the law when the trial court, over repeated objection, allowed the prosecutor to inject improper and irrelevant evidence and argument based upon his national and ethnic origin.
>
> II. Petitioner was deprived of the effective assistance of counsel when counsel failed to produce Solomon Burke as a witness to counter the claim that Petitioner acted with premeditation and malice aforethought.

Respondent maintains in an answer to the petition that Petitioner's claims lack merit.

**III. Standard of Review**

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.

> Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Finally, review is conducted in light of the law as it existed at the time of the final state court decision, *Teague v. Lane,* 489 U.S. 288 (1989), unless an intervening constitutional decision announces a 'watershed' rule of criminal law with implications for the fundamental fairness of the trial proceeding. *Caspari v. Bohlen,* 510 U.S. 383, 396 (1994).

*Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004). With this standard in mind, the Court will proceed to address Petitioner's claims.

**IV. Discussion**

    **A. The Prosecutor's Conduct**

Petitioner, who is from Trinidad, alleges that he was denied due process, equal protection of the law, and a fair trial when the prosecutor injected evidence of Petitioner's national origin and ethnicity into the trial. The Michigan Court of Appeals adjudicated this claim on the merits and concluded that the alleged prosecutorial misconduct did not deprive Petitioner of a fair trial.

The Supreme Court has stated that "[t]he Constitution prohibits racially biased prosecutorial arguments." *McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987). Lower courts agree that the injection of race, ethnicity, national origin, and cultural background into trial for the purpose of establishing guilt violates a defendant's right to due process and equal protection of the law. *See, e.g., United States v. Cabrera*, 222 F.3d 590, 594, 597 (9th Cir. 2000); *United States v. Vue*, 13 F.3d 1206, 1211-13 (8th Cir. 1994).

However, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004), *petition for cert. filed*, (U.S. Jan. 6, 2005) (No. 02-1403). To prevail on a claim of prosecutorial misconduct, Petitioner must demonstrate that the prosecutor's questions and remarks, taken in the context of the entire trial, were sufficiently prejudicial and infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 639, 643 (1974). When reviewing claims of prosecutorial misconduct, courts must first consider whether the prosecutor's conduct and statements were improper. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002). If the conduct and remarks were improper, the court must consider whether the impropriety was so flagrant as to violate the defendant's right to due process. *Id*. The four

4

factors for determining flagrancy are:

(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.

*United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994). It is not enough to show that the prosecutor's conduct was improper or even universally condemned; the conduct must be "so flagrant as to render the entire trial fundamentally unfair." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003), *cert. denied*, __ U.S. __, 125 S. Ct. 281 (2004).

### 1. The Prosecutor's Cross-Examination

The prosecutor asked Petitioner on cross-examination whether it was true that women in Trinidad do not possess many rights and whether it is a custom in Trinidad for men to hack their unfaithful wives with a machete to teach them a lesson. The prosecutor's disputed questions and Petitioner's responses, along with defense counsel's objections and the trial court's rulings, read as follows:

BY MS. NESSEL [the prosecutor]:

Q.   All right. So, Mr. Renwick, you were saying that you were upset by finding your wife on Belle Isle with another man, correct?

A.   [by Petitioner] Yes, ma'am.

Q.   Okay. And, in fact, the morning that you killed her, you were upset at that time, as well, were you not?

A.   Yes, ma'am.

Q.   And then you were actually upset all day long about it.

A.   Yes, ma'am.

Q.   Okay. And let me ask you, Mr. Renwick. You're from Trinidad, correct?

A. Yes, ma'am.

Q. Now, in Trinidad, isn't it true that women don't really have too many rights in Trinidad?

    MS. ROBINSON [defense counsel]: Objection, relevancy.

    MS. NESSEL: It goes to state of mind, your Honor.

    MS. ROBINSON: What does he know about the state of women's rights in Trinidad, and when?

    THE COURT: You can ask him what he thinks in that regard.

    MS. NESSEL: I absolutely will.

    MS. ROBINSON: I'd object to that, Judge. I mean that has nothing to do with this. It's not relevant to his state of mind, in terms of the adulterous or the betrayal by his mate, to what happens to women in Trinidad.

    MS. NESSEL: It goes to motivation. It goes to motivation.

    THE COURT: Well, he can tell what his state of mind is in that regard, but not what other people in Trinidad think.

    MS. NESSEL: I understand.

    CROSS-EXAMINATION (CONTINUED)

BY MS. NESSEL:

Q. Well, isn't it a custom in Trinidad – it's not uncommon for people whose wives have been unfaithful to them for them to use a machete on them, is it?

    MS. ROBINSON: Objection, your Honor, there is no relevance.

    MS. NESSEL: Please. If you give me a little bit of leeway, I promise you'll see where this is going with state of mind. I cannot ask it all in one question. If the Court believes I've gone out of bounds, then please strike everything. Just give me a few more questions.

    THE COURT: All right. For now, I'll take that objection under advisement.

6

CROSS-EXAMINATION (CONTINUED)

BY MS. NESSEL:

Q. That's true, isn't it?

A. I don't understand the question.

Q. That it's not an uncommon practice, in Trinidad, that if a man's wife has been unfaithful to him, that he uses a machete on her to teach her a lesson.

    MS. ROBINSON: Your Honor, can we have a foundation for the custom? What information is--what foundation? I mean I want you to have some foundation, here, in terms of this custom: time, place, groups, ethnic groups. In Trinidad there are several ethnic groups that have various customs.

    MS. NESSEL: Your Honor, I'm asking him if he's aware of this? Why do I have to lay a foundation for the -

    THE COURT: (Interposing) For that question, you don't need a foundation. I'll allow it.

CROSS-EXAMINATION (CONTINUED)

BY MS. NESSEL:

Q. Are you aware of that, sir?

A. Some of--the Indians, yeah. The Indians do it.

Q. Okay. So, you are aware that where you're from that's not an uncommon practice, correct?

A. Not uncommon.

Q. It happens there, correct?

A. It happens, yeah. Indians.

Q. And you, sir, also believe that if a person's wife has been unfaithful to them, that that's an appropriate way to teach them a lesson, using a machete on them?

7

   MS. ROBINSON:  Objection, your Honor.  That's totally inappropriate, what he believes.  This is totally inappropriate.

   MS. NESSEL:  How is it inappropriate, what he believes and what his state of mind is?

   MS. ROBINSON:  It's not relevant as to what he believes, his whole belief system.

   MS. NESSEL:  Your Honor, if he believes that it's okay to use a machete on a woman when she's been unfaithful, how is that not relevant to these proceedings, if that's in fact what he's done?

   THE COURT:  I think it's relevant. Overruled.

   CROSS-EXAMINATION (CONTINUED)

BY MS. NESSEL:

Q. Isn't that how you teach a woman a lesson who's been unfaithful to you?  You hack her up with a machete, right?

A. The Indians do that to them.

Q. Right. And that's what you decided to do in this case when you learned that your wife was being unfaithful, correct?

A. No ma'am.

Q. Well, when did you first decide to teach your wife a lesson for being with another man?  When did that first enter your thought pattern?

   MS. ROBINSON:  Objection.  Facts not in evidence.  He never said he was going to teach her a lesson.

   MS. NESSEL:  Your Honor, please.  This is cross-examination.  And I think at this point, the defense counsel is simply objecting so that she can interrupt me and for no other reason.

   THE COURT:  Overruled.

   CROSS-EXAMINATION (CONTINUED)

8

BY MS. NESSEL:

Q. When did you first decide you would teach your wife a lesson by using a machete on her?

A. I can't remember the exact time.

Q. Okay. But at some point, you decided that it would be a good idea, correct?

A. Yeah, at some time I was gonna teach her a lesson. But I can't remember the exact time I would teach her.

(Tr. Oct. 3, 2000, at 41-46.)

The Michigan Court of Appeals determined that there was no improper ethnic bias in the prosecutor's line of questioning because:

> [f]rom the context of the questioning, it is obvious that the prosecutor was not inquiring into defendant's religious background or cultural heritage. The prosecutor asked defendant if he was aware of a custom in Trinidad that some men will hack their unfaithful wives with a machete to teach them a lesson. Defendant replied, "The Indians do it." As defendant notes in his brief, there was no evidence introduced that defendant belonged to the Indian subpopulation of Trinidad. In fact, defendant's answer, "The Indians do it," implies that whatever cultural heritage he belongs to does not regularly engage in the same ritualistic behavior. Further, defendant's daughter testified that defendant looked specifically for the machete before using it on his ex-wife. On cross-examination, *defense counsel* questioned defendant's daughter to emphasize that the machete had come from Trinidad and that it had special meaning for him. It was defendant who originally made the link between the machete and Trinidad.
>
> . . . .
>
> [T]he prosecutor's line of questioning focused on defendant's knowledge that some men cut their unfaithful wives with machetes and his thought process in arriving at the decision to do the same to his unfaithful ex-wife. Defendant admitted, both on cross-examination and in his statement to police, that he decided to teach his ex-wife a lesson by cutting her. Why defendant decided to murder his ex-wife in a ritualistic manner is certainly relevant to a matter of consequence in the case. Defendant's state of mind, motive, and *intent* in killing her in that manner are non-character related reasons for the admissibility of this evidence.

*Renwick*, Mich. Ct. App. No. 232010, at 4-6 (emphasis in original).

This Court agrees that the prosecutor's questions were relevant to Petitioner's motive and state of mind and that evidence of a person's beliefs is admissible when probative of an issue in a criminal prosecution. *United States v. Beasley*, 72 F.3d 1518, 1527 (11th Cir. 1996). The disputed questions, however, established a link between Petitioner's national origin and a criminal practice. The prosecutor appears to have been attempting to establish a *modus operandi* based on national origin. This was improper. *See United States v. Shalash*, 108 Fed. Appx. 269, 278-79, 2004 WL 1801347, at **5 (6th Cir. 2004) (stating that the question "is not whether ethnicity was mentioned; it is whether the Government tried to connect ethnicity with criminal propensities" and further stating that references to ethnicity cross the prohibitory line when "they involve[] a Government lawyer questioning a law enforcement official, sometimes as an expert, about the criminal practices of an ethnic community for the purpose of establishing a *modus operandi* based on race").

Nevertheless, the trial court permitted the prosecutor to pursue the line of questioning, and it does not appear that the trial court was misled by improper considerations. The court did not mention Petitioner's national origin or cultural heritage in its findings of fact or conclusions or law. "In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." *Harris v. Rivera*, 454 U.S. 339, 346 (1981).

Furthermore, the strength of the evidence against Petitioner was overwhelming. *See infra* section IV.A.4. Even the evidence of premeditation was substantial apart from any testimony about customs in Trinidad. The Court therefore concludes that the prosecutor's conduct was not

flagrant and could not have had a "substantial and injurious effect or influence" on the trial court's decision. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Even assuming that the prosecutor's conduct rose to the level of a constitutional violation, the error was harmless.

### 2. The Prosecutor's Closing Argument

Petitioner contends that the prosecutor's closing argument also was based on improper evidence of Petitioner's ethnicity and national origin. According to Petitioner, the prosecutor inferred that premeditation was a trait of Petitioner's ethnicity and nationality. Petitioner acknowledges that "[i]t was never disputed that Petitioner caused the death of Ms. Murphy. The critical issue at trial was his actual level of culpability, *i.e.*, whether Petitioner possessed the requisite intent for premeditated murder, or as claimed by the defense, was suffering from intoxication and therefore [was] operating under a diminished capacity." Mem. of Law in Support of Pet. for Writ of Habeas Corpus, at 1.

The relevant portion of the prosecutor's argument reads:

> Now, let's look at his actions when he gets home. Well he prepares the murder weapons. The defendant probably already has the razor in his pocket, most likely he removed it from that cardboard that was found on the dresser in the bedroom when he went in there to drink, which is prior to taking his son to his cousin's house. *But know of course he needs to get a machete which is the traditional object we know that men use to kill their disloyal wives in his native home in Trinidad.*

(Tr. Oct. 10, 2000, at 12-13.) (emphasis added)

This comment was the prosecutor's only reference in closing arguments to the use of machetes in Trinidad. The comment was deliberately made, but brief. The prosecutor continued her argument by reviewing the evidence and by urging the trial court to find Petitioner guilty on

11

the basis of the facts. The evidence of premeditation was strong, and the Sixth Circuit "has been reluctant to grant habeas petitions based on improper prosecutorial statements at closing argument." *Wilson v. Mitchell*, 250 F.3d 388, 399 (6th Cir. 2001). The Court therefore concludes that, even if the prosecutor's statement about the use of machetes in Trinidad was improper, the impropriety was not flagrant.

### 3. The State Court's Decision

Petitioner alleges that the state court's adjudication of his prosecutorial-misconduct claim was contrary to Supreme Court precedent. He alleges that the court of appeals "misapprehended" the issue by stating that the issue involved an improper comment on Petitioner's religion. The court of appeals did say that Petitioner's claim concerned the prosecution's reference to Petitioner's religion, but the court of appeals also stated that Petitioner was objecting to the prosecutor's reference to ethnicity or cultural heritage. Thus, the court of appeals did not misapprehend the issue, and Petitioner's allegation has no merit.

Petitioner alleges next that, contrary to the court of appeals opinion, his attorney did not "open the door" to the prosecutor's egregious tactics. The record, however, supports the state court's conclusion. Petitioner's daughter, Marcia Renwick, testified on cross-examination by defense counsel that Petitioner asked her for help in finding a very old knife that had been in the family for a long time and that her father had brought with him from Trinidad. Marcia also testified that the knife meant something to Petitioner. (Tr. Oct. 2, 2000, at 71-72.) The prosecutor's questions to Petitioner about the use of machetes in Trinidad occurred later in the trial. Thus, the court of appeals was correct in concluding that it was Petitioner who originally made the link between the machete and Trinidad.

12

Finally, Petitioner asserts that there is nothing in the court of appeals decision to suggest that the court of appeals applied Supreme Court precedent to his claim. It is true that the court of appeals did not cite any Supreme Court decisions or even any federal decisions in its discussion of Petitioner's claim. However, avoiding the pitfalls of 28 U.S.C. § 2254(d) "does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original).

The court of appeals stated that the test of prosecutorial misconduct was whether the defendant was denied a fair and impartial trial, not a perfect one. This statement is consistent with *Donnelly*, 416 U.S. at 643 (suggesting that the test for prosecutorial misconduct is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process") and *Delaware v. Van Ardsdell*, 475 U.S. 673, 681 (1986) (stating that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one"). The state court's ultimate conclusion that the prosecutor's conduct did not deprive Petitioner of a fair trial was not contrary to, or an unreasonable application of, Supreme Court decisions.

### 4. Harmless Error

Petitioner contends that the prosecutor's conduct was not harmless. The Court disagrees, because the evidence of premeditated murder was overwhelming.

In Michigan, first-degree murder requires showing "that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v. Schollaert,* 194 Mich. App. 158, 170; 486 N.W.2d 312, 318 (1992).

13

> To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. [P]remeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'

*People v. Morrin*, 31 Mich. App. 301, 329-30; 187 N.W. 434, 449 (1971) (footnotes omitted). Premeditation may be inferred from the facts and circumstances, including "(1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *People v. Plummer*, 229 Mich. App. 293, 300-01; 581 N.W.2d 753, 757 (1998).

      Petitioner's son, Marcus Renwick, testified that Petitioner drove him to his cousin's house about 1:30 p.m. on the day of the murder. Petitioner acted normally and drove normally, but he said to Marcus, "You know that I love you, you'll be my best son, and whatever I do, try to forgive me."

      Petitioner's daughter, Marcia Renwick, testified that, when Petitioner returned from taking her brother to his cousin's house, he asked her about the location of the machete. Petitioner and Marcia looked for the machete for a short time, but did not find it. Petitioner then left the house. He returned five to fifteen minutes later with the machete, snuck up behind her mother, and attacked her with the machete.

      Petitioner testified that, on the night before the killing, he saw his ex-wife with another man. Although he and his ex-wife were divorced, he considered his ex-wife's conduct a betrayal, and he was upset. Later that night, he went to the nursing home where his ex-wife

14

worked and threatened her.

Petitioner admitted on cross-examination that his anger at his ex-wife had been building up for days and that he had considered killing her, their children, and himself. He also admitted that, on the day he killed her, he had been thinking about beating her to teach her a lesson. During the actual attack on his ex-wife, he heard her say, "Don't kill me."

The Court concludes that, in light of the evidence as summarized above, that the prosecutor's questions and references to Petitioner's native Trinidad could not have had a "substantial and injurious effect or influence" on the trial court's decision. *Brecht v. Abrahamson*, 507 U.S. at 623. Therefore, the alleged prosecutorial misconduct was harmless, and Petitioner has no right to habeas relief on the basis of his first claim.

### B. Assistance of Counsel

Petitioner's second and final claim alleges ineffective assistance of trial counsel. This claim has its origin in Marcus Renwick's testimony that, about an hour and a half before the killing, his father said to him, "Whatever I do, I love you," or "Whatever I do, try to forgive me." (Tr. Oct. 2, 2000, at 29, 32.)

The prosecutor referred to this conversation in her closing argument to show that Petitioner had premeditated the murder. (Tr. Oct. 10, 2000, at 12.) The trial court also mentioned Petitioner's comments to his son in the court's findings of fact and conclusions of law. The court appears to have relied on Petitioner's comments as a basis for finding that Petitioner premeditated the murder of his wife. (*Id.* at 41.)

Petitioner claims that his trial attorney should have called Solomon Burke[1] to counter the prosecutor's argument that Petitioner's plea for forgiveness was evidence of premeditated murder. Petitioner maintains that Burke's testimony would have corroborated Petitioner's own testimony that his comments to his son merely reflected his plans to leave the area and go to New York with a friend. (Tr. Oct. 3, 2000, at 33-34.)

The Michigan Court of Appeals determined that the witness's testimony would not have changed the outcome of the trial. In reaching this conclusion, the court of appeals noted that the testimony would have been cumulative to Petitioner's testimony and that the trial court based its finding of premeditation on other facts besides Petitioner's comments to his son.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

Second, a petitioner must show that counsel's deficient performance prejudiced him. A petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

> [T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need

---

[1] Petitioner refers to this witness as both Solomon Burke and Solomon Holder. The Court will refer to the witness as Solomon Burke.

>   not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed.

*Id.* at 697.

"Courts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client." *Towns v. Smith*, __ F.3d __, __, Nos. 03-1988/2030, 2005 WL 27148, at *7 (6th Cir. Jan. 7, 2005). Recently, the Sixth Circuit held that, where trial counsel failed to screen, supervise, or engage an expert witness who conducted no independent analysis and then became a witness for the state without any cross-examination, counsel's performance was "outside the wide range of professionally competent assistance" and prejudiced the petitioner because counsel's deficient performance undermined confidence in the trial's outcome. *See Richey v. Mitchell*, __ F.3d __, __, No. 98-01418, slip op. at 20-22 (6th Cir. Jan. 25, 2005). And in *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir.1987), the Sixth Circuit held that defense counsel's failure to locate and investigate "a known and potentially important alibi witness" constituted ineffective assistance because "[c]ounsel did not make any attempt to investigate this known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary."

Petitioner alleges that his attorney knew about Solomon Burke. Witnesses, however, are not always believed, *Richey*, slip op. at 22, and defense counsel might have concluded that Burke would not have helped Petitioner, given the strength of the evidence against Petitioner.

Even if defense counsel made no attempt to contact Burke or to investigate his potential testimony, the failure to investigate and produce Burke could not have prejudiced Petitioner. As

17

the Michigan Court of Appeals recognized, there were several other factors establishing the element of premeditation:

> These factors included defendant's statements that he had wanted to teach his ex-wife a lesson and that he had been thinking about it for a few days, his search for the machete, his sneaking up on his ex-wife to begin the attack, the brutality of the attack itself, and defendant's attempt to leave the scene and elude the police.

*Renwick*, Mich. Ct. App. No. 232010, at 8.

There is not a reasonable probability that Petitioner would have been acquitted of premeditated murder had counsel produced Solomon Burke as a witness. Therefore, defense counsel's performance was not prejudicial. Because Petitioner has not satisfied both prongs of *Strickland*, the state court's rejection of Petitioner's claim did not result in a decision that was contrary to, or an unreasonable application of, *Strickland*.

## V. Conclusion

For all the reasons given above, the Court concludes that Petitioner is not entitled to the writ of habeas corpus. Therefore, the application for the writ [Doc. #1, June 19, 2003] is **DENIED**. The Court **DECLINES** to issue a certificate of appealability because reasonable jurists would not find the Court's assessment of Petitioner's constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

      s/ DENISE PAGE HOOD_____
DENISE PAGE HOOD
UNITED STATES DISTRICT JUDGE

Date: May 27, 2005

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ALLAN S. RENWICK,

        Petitioner,

v.                                       CIVIL CASE NO. 03-CV-72377-DT

KURT JONES,                      HONORABLE DENISE PAGE HOOD
                                              UNITED STATES DISTRICT JUDGE

        Respondent,

_____/

## JUDGMENT

This matter having come before the Court on a Petition for the Writ of Habeas Corpus, United States District Judge **DENISE PAGE HOOD** presiding, and pursuant to the Opinion and Order entered on  May 27, 2005 .

IT IS ORDERED that the Petition for a Writ of Habeas Corpus is **DENIED**.

Dated at Detroit, Michigan on  May 27, 2005

                                                  DAVID J. WEAVER
                                                  CLERK OF THE COURT

                                                  By: s/ Wm. F. LEWIS
                                                       DEPUTY CLERK

APPROVED:

s/ DENISE PAGE HOOD
DENISE PAGE HOOD
UNITED STATES DISTRICT JUDGE

FILED
MAY 27 2005
CLERK'S OFFICE
DETROIT